UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RAMON ANTONIO RIVAS FERRERA**, *et al., individually and on behalf of all others similarly situated*,<br><br>  Plaintiffs,<br><br>  v.<br><br>**FOULGER-PRATT CONSTRUCTION INC.**, *et al.*,<br><br>  Defendants. | Case No. 1:24-cv-00262 (TNM) |

### MEMORANDUM OPINION

Four construction workers claim that they, and workers like them, got underpaid for their work on a public housing project in Washington, D.C. So they brought this collective action wage-and-hour lawsuit against the project's developer and general contractor (Foulger-Pratt Contracting LLC), and the subcontractor that hired them (Christian Siding LLC).

The parties settled. And now they jointly ask the Court to approve their settlement. The Court will do so because the settlement is a fair resolution of a bona fide dispute, not the product of employer overreach, and the result of arm's length bargaining conducted by experienced counsel. The Court will also ratify the parties' agreement on attorneys' fees and costs, as well as their agreement on service payments for the Named Plaintiffs (Ramon Antonio Rivas Ferrera, Jose Fredys Sanchez Amaya, German Alfaro, and Yeris Moises Rodriguez Machado).

### I.

Plaintiffs performed construction work on an affordable housing project known as the "Paxton." Compl. ¶ 1, ECF No. 1. The project sits in Washington, D.C., and received part of its

funding from the District of Columbia.  *Id.* ¶¶ 1, 19.  Foulger-Pratt Contracting LLC served as the project's developer and general contractor.[1]  *Id.* ¶ 20.  And Foulger-Pratt subcontracted with Christian Siding LLC for carpentry work.  *Id.* ¶ 21.  Christian Siding, in turn, hired Plaintiffs and other similarly situated individuals to work on the project.  *Id.* ¶ 22.

Plaintiffs allege that they got underpaid for their work.  In a usual workweek, Plaintiffs say that they and other similarly situated individuals worked on the project from 7:00 a.m. to 5:00 p.m. Monday through Friday, with a one-hour unpaid lunch break.  *Id.* ¶ 31.  On Saturdays, they typically worked 7:00 a.m. to 3:00 p.m. with a 15-minute paid break.  *Id.*  Tallied up, Plaintiffs allege they worked "well more than 40 hours per workweek."  *Id.*

But rather than paying Plaintiffs as hourly employees, Christian Siding characterized them as independent contractors.  *Id.* ¶ 30.  Plaintiffs say this was unlawful because Christian Siding controlled nearly every facet of their work.  For instance, Plaintiffs allege that Christian Siding set their schedules, assigned their tasks, and supervised them—all according to "Christian Siding policies" that Plaintiffs were "required to abide by."  *Id.* ¶ 27.  Plaintiffs claim the misclassification persisted until December 2023, when Christian Siding changed its payroll practices and began paying Plaintiffs an "hourly rate via payroll checks that made deductions for taxes."  *Id.* ¶ 36.  When Christian Siding made the switch, Plaintiffs say their duties and the extent of Christian Siding's oversight stayed the same.  *Id.*

Plaintiffs allege that pay violations occurred both when they were improperly designated independent contractors and when they were declared employees.  Because the Paxton project

---

[1] The parties agree that Foulger-Pratt Contracting LLC (not Foulger-Pratt Construction Inc.) should have been named as a Defendant here.  *See* Joint Mot. to Approve Settlement Agreement at 1 n.1, ECF No. 19-1.  The error has been corrected in the parties' executed settlement agreement.  *See* Settlement Agreement & Release, ECF No. 19-2.

qualified as a D.C. Public Works Project, Plaintiffs argue they were entitled to "prevailing wages and benefits" under District of Columbia law. Compl. ¶¶ 5, 57–58. Plaintiffs say the prevailing wage for the Paxton project should have been $44.14 per hour. *Id.* But when Christian Siding misclassified Plaintiffs as independent contractors, it only paid them a purported "daily rate" that ranged between $130 and $180 a shift.[2] *Id.* ¶ 32. And when it reclassified them as employees, it only paid them between $13.58 and $18.11 per hour. *Id.* ¶ 5. Plaintiffs also claim that they never received overtime pay. *Id.* ¶ 37. So in their view, Christian Siding "cheated [them] out of approximately $30.00/hour for straight time hours and more than $50.00/hour for overtime hours." *Id.* ¶ 6.

Plaintiffs eventually sued Christian Siding and Foulger-Pratt. The Complaint alleges violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, the D.C. Minimum Wage Revision Act, D.C. Code §§ 32-1001 *et seq.*, the D.C. Wage Payment and Collection Law, D.C. Code §§ 32-1301 *et seq.*, and the D.C. Workplace Fraud Act, D.C. Code § 32-1331.01–15. *See* Compl. ¶¶ 45–95.

Plaintiffs also allege that Christian Siding's payment practices impacted similarly situated individuals who worked on the Paxton project. So, at Plaintiffs' request, the Court certified this case as a collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), and D.C. Code § 32-1308(a)(1)(C)(III). *See* Certification Order, ECF No. 16. The Certification Order applies to any Christian Siding employee who worked on the Paxton project at any time

---

[2] Plaintiffs allege that Christian Siding did not pay them a true "daily rate" typical of independent contractors. Compl. ¶ 33. If a shift got shortened for weather or power, for instance, "Christian Siding paid less than the daily rate, sometimes as little as 1/4 of the daily rate." *Id.* And the subcontractor similarly whittled down the daily rate when "an employee had to leave the shift early, or took a break on a Saturday shift longer than the 15-minute paid break." *Id.* Plaintiffs say this variable pay further proves that they were hourly employees, not independent contractors.

within the three years before that Order. *Id.* ¶ 1. And it gives potentially affected employees the ability to opt-in to the collective action. *Id.* ¶ 5.

Informal discovery followed the Certification Order, as did intense negotiations with a third-party mediator. *See* Joint Mot. to Approve Settlement Agreement ("Settlement Mot.") at 4,[3] ECF No. 19-1. Though the mediation session ended without a resolution, the parties continued their conversations and ultimately reached an agreement. *Id.* In July, they executed a Settlement Agreement and Release. *See* Settlement Agreement & Release, ECF No. 19-2.

Under the Agreement, Christian Siding has agreed to pay $900,000 to settle the claims here against both itself and Foulger-Pratt. Settlement Mot. at 4–5. The Agreement allocates that sum as follows: (a) settlement payments to eligible current and former workers who wish to join the settlement up to $675,000, inclusive of $5,000 service payments to each of the Named Plaintiffs, and (b) Plaintiffs' counsel's fees and expenses of $225,000. *Id.*

The parties estimate that 43 current and former Christian Siding employees are eligible to participate in the collective. *Id.* at 5. And under the Agreement, "Individual Settlement Amounts" will be calculated on a pro rata basis, drawing on number of hours each individual worked compared to the total hours worked by all members in the collective. *Id.*

More, the Agreement obligates Christian Siding to pay additional funds to previously unidentified members of the collective if they can show—to the satisfaction of all parties' counsel—that they worked on the Paxton project but were not previously identified. *Id.* Christian Siding will separately pay for the costs of settlement administration, and the parties have agreed to use ILYM Group, Inc. as the Settlement Administrator. *Id.*

---

[3] The Court's page citations refer to the pagination generated by CM/ECF.

In exchange for the payments, Plaintiffs and any workers who opt-in to the collective action will release Defendants from all wage-and-hour claims. *Id.* at 6. Defendants deny any and all liability to Plaintiffs. *Id.* at 8.

Now the parties jointly ask the Court to approve the Agreement.

## II.

In most cases, parties can privately settle their difference and voluntarily dismiss a case. *See* Fed. R. Civ. P. 41(a)(1). But this case is different because it involves an FLSA claim. *See* Compl. ¶¶ 45–55.

Nearly 80 years ago, the Supreme Court declared that FLSA claims cannot be privately compromised or settled like most other claims. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945); *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 114 (1946). The difference stems from the FLSA's "statutory policy" of protecting workers. *O'Neil*, 324 U.S. at 704. In the Court's view, "allow[ing] waiver of statutory wages by agreement would nullify the purposes of the Act." *Id.* at 707. Given the public policy friction, courts often invalidate private FLSA settlements. *See, e.g.*, *Carillo v. Dandan Inc.*, 51 F. Supp. 3d 124, 129 (D.D.C. 2014) ("[P]rivate settlements that purport to bar further suit against an employer in exchange for less than the full value of wages, overtime, and liquidated damages, to which the employee is entitled under the FLSA, are invalid.").

Yet there are still two ways FLSA claims can be settled or compromised: through a settlement supervised by the Secretary of Labor, 29 U.S.C. § 216(c), or through a settlement scrutinized and ratified by a "court of competent jurisdiction," *id.* § 216(b). *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353–54 (11th Cir. 1982); *see also Gangi*, 328 U.S. at 113 n.8 (suggesting, in dicta, that "the requirement of pleading the issues and submitting the

5

judgment to judicial scrutiny may differentiate stipulated judgments from compromises by the parties").

This two-path framework provides a sensible guide for most FLSA settlements, but the law does not rigidly require it. Indeed, "the D.C. Circuit has not opined about whether judicial approval is *required* of FLSA settlements reached after an FLSA suit has been filed or the related issue of whether such approval is a *prerequisite* for subsequent judicial enforcement of a private settlement." *Carrillo*, 51 F. Supp. 3d at 129 (emphasis added). And the "FLSA does not expressly mandate" ex ante approval. *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 486 n.2 (D.D.C. 2019). Still, courts in this district routinely review proposed settlements to avoid putting "the parties in an uncertain position" regarding the validity of their settlement. *Carrillo*, 51 F. Supp. 3d at 131; *accord Trout v. Select Grp. Fed., LLC*, No. 21-cv-1684, 2023 WL 6583828, *3 (D.D.C. Oct. 10, 2023) (reviewing proposed FLSA settlement in collective action).

The parties here have invoked the second path—they "have mutually sought judicial approval of their proposed settlement." *Carrillo*, 51 F. Supp. 3d at 131. So the Court will review it. But the Court will cabin its review only to those terms "addressing the compromised monetary amounts to resolve the pending wage and hour claims." *Id.* at 134. The Court will not pass on the enforceability of other provisions in the Agreement. *See id.*

### III.

Two steps guide judicial review of FLSA settlement agreements. "First, the Court must ensure the agreement resolves a bona fide dispute—that is, it reflects a reasonable compromise over issues that are actually in dispute." *Davis v. Kettler Mgmt.*, 21-cv-3351, 2022 WL 17146742, at *1 (D.D.C. Nov. 22, 2022) (cleaned up). Second, the Court must confirm that "the agreement is substantively fair." *Id.* Beyond these two steps, the Court should also review the

6

reasonableness of provisions for attorneys' fees and service payments. *Trout*, 2023 WL 6583828, at *4, *7–8. The Court analyzes each component in turn.

### A.

The Agreement resolves a bona fide dispute. "A settlement is bona fide if it reflects a reasonable compromise over issues that are actually in dispute, since merely waiving a right to wages owed is disallowed" under Supreme Court precedent. *Carillo*, 51 F. Supp. 3d at 132 (cleaned up). The Agreement here fits that bill. It resolves real disputes, such as the amount of overtime Plaintiffs worked and whether the law entitles them to prevailing wages. *See* Settlement Mot. at 8. And Defendants still "deny any and all liability to Plaintiffs," even after months of protracted litigation. *Id.* So the parties have hashed out genuine disagreements; Plaintiffs have not simply waived away their rights. *See Trout*, 2023 WL 6583828, at *4.

### B.

The Agreement also fairly resolves the substance of Plaintiffs' claims. Three factors bear on the fairness of an FLSA settlement: (1) whether the settlement stemmed from employer overreach; (2) whether it was the "product of negotiation between represented parties following arm's length bargaining"; and (3) "whether there exist serious impediments to the collection of a judgment by the plaintiffs." *Carrillo*, 51 F. Supp. 3d at 132 (cleaned up). The Court considers each factor below, "mindful of the strong presumption in favor of finding the settlement fair." *Id.* at 133 (cleaned up).

*First*, the Agreement shows no signs of employer overreach. Consider one of the most common proxies for evaluating overreach: comparing the settlement sum against "plaintiffs' position and defendants' position." *Sarceno v. Choi*, 78 F. Supp. 3d 446, 451 (D.D.C. 2015). The likelihood of undue influence lessens as the amount moves closer to plaintiffs' position.

7

Under that rubric, Plaintiffs got a good deal.  They estimate Christian Siding owes them $591,000 in backpay.  Settlement Mot. at 10.  Christian Siding thinks the number falls somewhere between $23,000 and $385,000, depending on the applicable wage rate.  *Id.*  The Agreement provides for $655,000, after attorneys' fees and service payments.  *Id.*  This figure eclipses the highest backpay estimate and reflects a compromise on Plaintiffs' entitlement to the prevailing wage rate and liquidated damages.  *Id.*

Consider another way to rule out overreach: consulting the views of experienced counsel.  When the parties' counsel have "extensive experience in pursuing and defending FLSA actions generally and familiarity with the underlying facts," courts can credit their representation "that the amounts agreed upon are a reasonable compromise."  *Sarceno*, 78 F. Supp. 3d at 451.  Plaintiffs are represented by Arlus Stephens and Mark Hanna of Murphy Anderson PLLC.  *See* Stephens Decl. ¶¶ 1, 3, ECF No. 19-5.  These attorneys, and their firm more generally, have extensive experience litigating wage-and-hour cases in federal court.  *Id.* ¶ 2.  And they are thoroughly familiar with this case.  *Id.* ¶¶ 5, 7.  In their estimation, Plaintiffs have agreed to a fair, adequate, and reasonable settlement.  *Id.* ¶¶ 14, 17, 20.

*Second*, the Agreement follows negotiations by experienced counsel who facilitated arms' length bargaining between the parties.  Both sides thoroughly investigated potential claims and defenses, conducted meaningful informal discovery, and participated in several virtual conferences to try to reach an agreement.  *Id.* ¶ 7.  When those yielded little results, the parties participated in a full-day mediation session assisted by a JAMS mediator.  *Id.* ¶¶ 10, 11.  After that, the parties hammered out a deal crafted by experienced counsel.  *Id.* ¶ 14.  So from a process perspective, the Agreement "bears all the indicia of one that leads to a just outcome."  *Carrillo*, 51 F. Supp. 3d at 134.

*Third*, the Agreement allows Plaintiffs to recover now and removes litigation-associated impediments to recovery. Indeed, "by settling now, [Plaintiffs] will obtain a recovery without further delay and without incurred additional litigation costs and additional attorney's fees and costs." *Id.* (cleaned up). Under the Agreement, Plaintiffs will likely receive their pro rata shares within the year, "which is undoubtedly quicker than this case could proceed to judgment given the typical time frame for discovery and the Court's heavy trial calendar." *Trout*, 2023 WL 6583828, at *6.

In sum, the parties' Agreement reflects a fair resolution to a bona fide dispute.

### C.

Finally, the Agreement includes reasonable provisions for attorneys' fees and service payments. *See Trout*, 2023 WL 6583828, at *7–8 (evaluating these kinds of provisions).

Start with the fee provision: Plaintiffs' counsel will receive $225,000 in attorneys' fees and costs. Settlement Mot. at 12. Two indicia confirm this provision's reasonableness. For one thing, the fees represent 25% of the total recovery in this collective action. That percentage falls well within the realm of previously approved fee awards. *See, e.g.*, *Trout*, 2023 WL 6583828, at *7–8 (approving attorneys' fees that constituted 40% of the total settlement); *Eley v. Stadium Grp., LLC*, 236 F. Supp. 3d 59, 65 (D.D.C. 2017) (37%); *Carrillo*, 51 F. Supp. 3d at 133–34 (roughly 50%).

More, the 25% fee also falls below the lodestar figure for Plaintiffs' counsel. To date, attorneys at Murphy Anderson have dedicated 465 hours to this litigation, accruing fees of $317,400 under the Fitzpatrick Matrix. *See* Stephens Decl. ¶¶ 22, 24. They have also incurred $1,610 in costs. *Id.* ¶ 22. While Plaintiffs would ordinarily be required to prove their entitlement to Fitzpatrick rates, the figure still provides a baseline for measuring the

9

reasonableness of the Agreement's fee provision. *See J.T. v. District of Columbia*, 652 F. Supp. 3d 11, 32 (D.D.C. 2023) (utilizing the Fitzpatrick Matrix "for complex federal litigation"). And the Agreement's fee provision compares favorably; it represents a 30% discount on Fitzpatrick-calculated fees.

Next, service payments: Each of the four Named Plaintiffs will receive $5,000 as service payments (otherwise known as "incentive payments" or "incentive awards") for their active roles in this case. *Trout*, 2023 WL 6583828, at *8. A few factors bear on the reasonableness of service payments. These include "the actions that the plaintiff has taken to protect the interests of the class, the degree to which the class benefitted from those actions, and the amount of time and effort that the plaintiff expended in pursuing the litigation." *Id.* (cleaned up).

The balance of these factors confirms the reasonable nature of the service payments. Named Plaintiffs devoted a great deal of time to this litigation. They provided "important information to counsel regarding the facts on the ground; worked with counsel to prepare and review the Complaint; stayed informed about the case; communicated regularly with counsel throughout the settlement process"; attended an all-day mediation session; and facilitated communications with other co-workers on the Paxton project. Stephens Decl. ¶ 16. In short, Named Plaintiffs contributed to this matter, facilitated its resolution, and did so to the benefit of other members in the collective. That justifies their proposed service payments, which fall within the ballpark other approved service payments. *See, e.g.*, *Trout*, 2023 WL 6583828, at *8 (approving a $4,000 service payment); *Meyer v. Panera Bread Co.*, No. 17-cv-2565, 2019 WL 11271381, at *10–11 (D.D.C. Mar. 6, 2019) (same for payments between $5,000 and $10,000); *Little v. Wash. Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 35 (D.D.C. 2018) (same for payments between $5,000 and $7,000).

## IV.

All around, the parties' Agreement reasonably and fairly resolves this bona fide wage-and-hour dispute.  So the Court will approve it.  A corresponding Order will issue today.

_____
Dated: August 26, 2024                                    TREVOR N. McFADDEN, U.S.D.J.